Your honors, counsel, ladies and gentlemen, I'm John Horn. I represent Melissa Vanproyen, plaintiff appellant, the brain-damaged young woman who brought this case. Ms. Vanproyen's brain damage has resulted in her requiring special supervision, essentially a nanny. And at the hearing, the vocational expert testified that anybody who requires special supervision is unemployable for purposes of Social Security law. The administrative law judge, one of the reasons she rejected Ms. Vanproyen's testimony and that of her boyfriend was that Ms. Vanproyen could follow a written schedule, but the administrative law judge omitted that Ms. Vanproyen required a reminder to look at the schedule, because there's no point in having a schedule if one doesn't look at it. The opinion of the treating psychiatrist was that Ms. Vanproyen had to have special supervision to sustain ordinary employment. The results of the consultative exam supported the opinion of the treating psychiatrist. The consultative examiner found that Ms. Vanproyen was lacking in attention and concentration throughout the examination. The consultative examiner found that Ms. Vanproyen's memory was reduced. She could recite four of six digits forward, three of six digits backwards, could not repeat three objects after three minutes or five minutes, and she recited symptoms of hopelessness, helplessness, and anhedonia, or lack of interest. Ms. Vanproyen testified that she was carried at her job. In some respects, she had to have others take in her orders. She was a waitress, and she had to have help carrying trays. She had to have easier shifts. She even paid other people to do some of her work. This was not properly evaluated by the administrative law judge under 20 CFR 1573. The administrative law judge rejected the basis of activities of daily living without a thorough analysis of Ms. Vanproyen's activities of daily living, because she had help doing practically everything that she did. Finally, the administrative law judge... Well, she doesn't have someone with her 24-7. No, not 24-7, but close to it. She, as I read the record... No, she's alone with her child all day long. Oh, no. Oh, no, she's not. She is alone with her child less than 20 hours a week, as I analyze the record. Her boyfriend only works 24 hours a week? Well, her mother comes over, and other people come over, if I recall correctly. I thought her mother just checked in on her by phone, occasionally dropping in. It just wasn't clear that she requires the level of supervision that you're articulating right now. Clearly, on the job, when she went back to her waitressing job after her fall and head injury, she reduced her hours, only working three days a week. She needs help, gets accommodations from the employer, etc. That's very clear in the record, but in terms of her functional capacity at home, I mean, she's not a risk to her child as a parent, right? Well, whether... I couldn't say whether she's a risk... You're painting a very dire picture here, and I'm not sure the record supports that. It may support your argument that she can't work, but let's not exaggerate. The exact testimony of her boyfriend was that she has to have reminders to follow her list of activities. So it could be possible that there is some danger there. I don't know. The record is definitely unclear on that point. But I seem to remember the figure of 20 hours that she was left alone with the child. It's in my brief. I'll have it on the exact page citation on rebuttal. But I seem to remember that she's not really spending much more than 20 hours a week with that child. Another point on which the administrative law judge's opinion is inadequate is with respect to the side effects of claimant's medications. Claimant testified that they made her drowsy. And they improved her memory, but she couldn't take them because they made her drowsy. So the idea that her problem was solved by medication is incorrect because the medications brought different problems altogether. The opinion of the treating physician was that claimant's fibromyalgia would cause her to miss at least four days a month and would cause her to be off task 25% of the time. And being off task is consistent with the opinion of the consultative mental examiner that claimant was not maintaining attention and concentration throughout the exam and the opinion of the treating psychiatrist that claimant was unable to maintain attention and concentration. And if you can't be on tasks more than 75% of the time, actually it's a little bit higher than that, you're unemployable for social security purposes. So... What's her primary diagnosis? Is it the symptomology of the head injury? Yes, I'd say so. That's the primary diagnosis. So it's just Dr. Carter who's the primary treating physician on those? He prescribes her anti-seizure and her other brain injury medications? I couldn't tell you if he is the person who prescribes those medications. He's the treating psychiatrist. There's also a neurologist. And his opinion, as I read it, was that she couldn't work a full day. And of course, to be employable for social security purposes, one must be able to work a full day. He's probably the anti-seizure med prescriber. And the seizures are generally under control with the medications. The seizures aren't the primary problem, although they have caused her difficulty. She had an auto accident when she had one of her seizures. The primary problem is she can't work without special supervision. Are there any other questions? And the loss of capacity in that sense is not treatable with medications, I take it? Because it's a cognitive issue? If I'm reading the record correctly? The medications that improve her memory cause her to be drowsy. Okay. Thank you. Okay, thank you, Mr. Horn. Ms. Schacht? Good morning. May it please the Court, my name is Meredith Schacht on behalf of the Acting Commissioner of Social Security. The ALJ acknowledged in this case that Ms. Van Pruyen experienced limitations as a result of her brain injury and her other impairments. But the ALJ determined that there were nonetheless jobs in the economy that Ms. Van Pruyen could perform. Her determination in that regard was supported by substantial evidence. And the ALJ did not err in considering the subjective statements of either Ms. Van Pruyen or her boyfriend. Well, can she work a normal 40-hour week? Yes, that was the finding of the ALJ, that she could work a full 40-hour week. How is that possible with her problems and her medication and fibromyalgia and so on? The ALJ found that the evidence was insufficient to establish that she was limited from working less than 40 hours a week. There was one point where her treating neurologist said that she should be limited to 6 hours at a time of working. That opinion came at a time when she had stopped taking her anti-seizure medications against the advice of her physician. Well, according to your opponent, it made her drowsy. She did report that at the time. That's true. That's why she stopped taking the medications. Well, it's hard to work if you're drowsy, isn't it? Certainly, it is sometimes hard to work when you're drowsy. Why do you say sometimes? Because it's not always work-preclusive to be drowsy. Really? And furthermore, Your Honor... What kind of work do you have in mind where you can be drowsy and not off to sleep and so on and still do a 40-hour week? Well, she may have been drowsy at the time that she made that report to her neurologist, Your Honor, but at the time of the hearing, when she was sitting across from the ALJ, she told the ALJ, I have no side effects from my medication. She did not report that. She said what? I have no side effects from my medication. The ALJ said, do you have side effects from your medication? And she reported, not that I noticed, no. So she said to the ALJ's face, I do not experience side effects. Counsel is now saying that she testified otherwise, but that was the testimony that the ALJ heard. What do you mean? He says she testified otherwise and you say it was inaudible or what? I don't know the basis of counsel's assertion that she testified that she had side effects from her medication. The testimony that I see in the transcript, she responds to the ALJ's question about side effects with the answer, not that I noticed, no. So there's no evidence that she has drowsiness? She reported to her neurologist in December of 2010 that she experienced drowsiness. That was before her amended onset date. That was before she asserts being disabled. She reported to her neurologist that she experienced drowsiness and that's why she stopped taking her medication. Her neurologist then explained to her how important it was to take her medication and restarted her on her medication. At that time, he said that she should be limited to working six hours at a time and should not drive. The following month, she came back to the neurologist and said that she had not had a seizure since then The neurologist examined her, gave an opinion or stated in his records that she should not drive but he no longer repeated the limitation to a six-hour workday. Did he lift it? He didn't expressly lift it, but he didn't repeat it. And he did repeat that she should not drive. And the ALJ adopted that opinion, that she should not drive and she should not be exposed to hazards even though her seizures are under good control with the medication. But the ALJ did adopt the opinions from Dr. Yilmaz, her treating neurologist, that he gave in January of 2011 which again was before her amended alleged onset date but nonetheless, the ALJ understood the severity or the dangers that a seizure disorder posed and included those limitations. Can she get to work if she doesn't drive? There's no indication that she can't. The activity reports that she submitted, that both she and her mother submitted indicated that she doesn't drive. If she goes in a car, somebody else drives. But she does go out on her own. She can walk. She can walk to work? Potentially, Your Honor. I suppose it depends on... What's the distance? Whether there's a specific job is not the issue when considering... Why not? Because the issue is whether there is a job in the economy. There's a walking distance for her. How can she be employable? Well, certainly there's other transportation options, Your Honor. How do you know? Is there evidence of that? Your Honor, the regulations... Is there evidence of that? I don't know that there's specific evidence. I don't... What does specific mean in this setting? What's the general evidence? Well, the general rule under the regulations, Your Honor, is that if there are jobs available in the economy that an individual can perform under her residual functional capacity, then she is not disabled under the Social Security Act. So you're saying it's irrelevant whether the work is... That is what I'm saying, Your Honor. Whether she can work or not is irrelevant? Whether there is a specific job within walking distance of her home. There's public transportation. She has never had any... What if she lives in a small... Not this particular one. I don't know where she lives. What if she lives in a small town that doesn't have public transportation? The availability of a specific job is not the standard. It is not the standard included in the Social Security Act or its enabling regulations. Does that make sense to you? Yes, Your Honor. Why? The administrative burden of establishing whether there is a specific job available to a specific person I think would be extreme. What if the only job is in Alaska? That's certainly not the case here, Your Honor. That's not my question. If there were a... You answer my question. If there were a significant number... Look, if there's a job available in Alaska, that's the only job she could perform, but she can't get to Alaska, is she still not disabled? One job, Your Honor, is not a significant number of jobs in the economy. You answer my question, would you please? Then no. If there's one job available in Alaska, she would be disabled. If that is the only job that she could do. Because one job is not a significant number of jobs in the economy. Well, what if there are 10 jobs in Alaska? There's been case law that says 10 jobs is not a significant number of jobs in the economy. Well, how many do they have to be? Several hundred, I believe, is what the case law has established. What's the minimum? Your Honor, I've seen 200, 300... These are hypothetical questions, Your Honor. So there are 200 or 300 jobs that she can perform in the United States somewhere. Is that what you're saying? That is not what I'm saying in this case, Your Honor. There were thousands, tens of thousands of jobs that she could perform in this case. Tens of thousands of jobs that she can perform? In the state of Illinois. In just Illinois? Yes, Your Honor. Tens of thousands of jobs? Yes, Your Honor. All vacant, I suppose, waiting for her? That is not the standard, Your Honor. The ALJ did not err here with regard to her consideration of the opinion evidence or with regard to her evaluation of Ms. Van Pruden's testimony. What about her fibromyalgia? She had fibromyalgia, Your Honor. It was a diagnosed impairment. The ALJ acknowledged it as a severe impairment. I'm sorry, he did what? The ALJ acknowledged and found in her decision that it was a significant impairment. I'm sorry, I'm not hearing you. The ALJ in her decision acknowledged the diagnosis of fibromyalgia and found it to be a severe impairment. But it doesn't affect her ability to work? It does affect her ability to work, but it doesn't make her unable to work. What does that mean? It means that she's limited to light work without significant physical obligations. It means that she has some mental limitations on the type of work that she can do. But just because she has a diagnosis of fibromyalgia, that does not leave her unable to work. That is not... What would be an example of a job that she can perform despite her fibromyalgia and other problems she has? The ALJ found, based on vocational expert testimony, that she could, for example, perform the job of cashier. This is her fibromyalgia doctor. Is Dr. Jones... Dr. Jones is her primary care physician. She did see, I believe, two different rheumatologists specifically for her fibromyalgia complaints. She saw them only once. So Dr. Jones, I think, was sort of... was sort of the background treater. And the ALJ said she was giving little weight to that treating physician's opinions because the doctor only saw the patient twice a year? That was one of her considerations. That's just sort of routine medical practice. You go to see your general practitioner maybe once a year, twice a year? I don't know why that... That is absolutely routine. Why should that be a reason to discredit that treatment? Because the limitations that she opined were not routine. She opined significant limitations experienced by the plaintiff that would suggest that she should have been receiving more frequent care. She had quite severe opinions about... even about turning her head, lifting her head, looking up, lifting her shoulders, using her arms. She said she could only sit for 20 minutes. Very significant limitations that were unsupported by her treatment history. And that was not the only reason that the ALJ discredited Dr. Jones's opinion. The ALJ also noted that her opinion that she gave in 2012 was contrary to the opinion that she gave in 2010, which clearly... which cleared Ms. Van Perien to return to work without any limitations. What kind of jobs has she held? Previously she worked as a waitress. I believe that's the only... that's the only job that I'm recalling from the record. And the ALJ found she could no longer do that job as a waitress, but that there were other jobs that she could perform. She could be a cashier, you said? For example, yes, or a shipping and receiving clerk, I think, or a routing clerk was another job that was on there. What was the other job? Shipping and routing clerk was the other job, also with a significant number of jobs. I'm sorry, I didn't hear you. What kind of clerk? Shipping and routing clerk. A shipping clerk? What is a shipping clerk? Essentially a mail... a mailroom clerk is my reading of the description, Your Honor. I see my time's up. I'm happy to entertain more questions, but if not, we would ask that you affirm the ALJ's decision. Okay, thank you, Ms. Shaw. Thank you. Mr. Horne? Anything further? Thank you, Judge. I stand corrected as to the matter of the medications. As counsel correctly pointed out, the statements about the medications were to the doctor, not to the ALJ. Secondly, the testimony of Ms. Van Prooyen's boyfriend was that he looks after the baby most of the time during the... Oh, I'm sorry. Van Prooyen looks after the baby most of the time during the 20 hours that her boyfriend is away at work. And, let's see, with respect to a cashier, the opinion of the consultative mental examiner was that Ms. Van Prooyen couldn't handle funds, so I think she might have some difficulty as a cashier. Is there anything else that the court would like me to address? I guess not. Thank you. Okay, well, thank you, Mr. Horne and Ms. Shaw. We'll move to the next item.